Good morning, welcome to the United States Court of Appeals for the Sixth Circuit. I'd like to remind you if you represent the appellate that it helps us if you tell us how much time you want to reserve for rebuttal, even if you've already settled that with the clerk. And with that, the clerk may call the first case. Case number 18-3034, United States of America v. Demetres Ward. Oral argument not to exceed 15 minutes per side. Mr. Chadd for the appellate. Good morning, your honors, counsel, may it please the court. I'm here this morning representing Demetres Ward and I would like to reserve three minutes for rebuttal if I may. Thank you. Your honors, the Supreme Court promulgated the exclusionary rule for cases just like this. In this case, we have police misconduct which violates the Fourth Amendment. And as a result of that misconduct, criminal activity is found. The only remedy in this case is for this court to issue an opinion, tell the police officers that this conduct is not allowed under the Fourth Amendment, and to suppress the evidence that was found as a result of this misconduct. In this case, Demetres Ward was seized by the police officers at approximately 1.30 in the afternoon while he was standing in front of a convenience store with his friends. He didn't seem too seized when he threw the gun away, did he? He was not seized when he threw the gun away, I will admit that, your honor. However, prior to that point, he was seized for at least three minutes. I'm trying to figure out if he was seized and if so, when he was seized. It's really interesting in this case, I think, to actually watch this dashboard camera because he sure doesn't look to be seized. He looks like he's wandering around, he's got his back to the police most of the time, he's dealing with his dog, he's telling his dog to sit. He doesn't seem to be motivated or affected by the police at all until arguably they say, come over here. And that can't constitute a seizure unless you submit to come over here. And in fact, he ran. So the standard is, Judge McKeague, that would a reasonable person have felt free to leave at whatever point in time that we're talking about when he was seized? Even if you have given your license and the police are holding the license, you still haven't been seized if you run. And when you're leaving your license there, they hadn't taken anything from him, they really hadn't even dealt with him. Well, Your Honor, there were several facts which I think led to the district court's decision. And keep in mind, the district court decided that he... There's a possibility the district court is wrong. There is a possibility that the district court is wrong. And usually I'm here arguing that. But in this case, the district court was correct. He was seized at at least no later the time when they started the pat-downs. And there are several facts which I think absolutely this court can rely on to find that he was seized at least no later than that time frame. Number one, we have four police officers that come up on these three individuals. One of the two cruisers has its lights on. You can see that from the video. They initially surround Mr. Ward and his friends. There's officers behind Mr. Ward and there's officers in front of Mr. Ward. For the most part, and watching the tape, because I was going to ask you about that, there's no officer on the side of Mr. Ward to which he ran? Well, there was... They're all on the front. They're all on the other side, actually to his back, dealing with the guy in the white shirt. At the time that he runs, I will agree with you that there was no officer to that side. But if you look at the first part of the video, it's clear that there actually is an officer that is on the other side of him at the time that they first come up to him. That's because that other cop car came up the street, the one that you're talking about with the lights on, and he simply walked around the side of the vehicle in which they thought the drug dealing was occurred. At that point, he would have been on what we'll call the other side of your client. But that was to just get around to where the other guys were. Well, and that was actually the officer that frisked the other individual that we can see in the video. Can I focus to what I think is the best argument on this side? Yes, Your Honor. I mean, obviously the police, the police cars, those things are there all the time. Isn't the key point that they ask whether we can frisk them? So it's consensual. You can consensually agree to be frisked, and the question... And Hunter says no. The question is whether they're directing this ask to everybody, including Ward or not. But it seems to me that's the compelling moment on this point. And it's not clear to me whether the conversation is directed just to Hunter, because surely when Hunter says no, you can't do that, and they do it anyway, what reasonable person would think they can leave? And the question then is whether they're directing that question to Ward as well, and he would then feel, having said no, all of them, I think, I'm not sure. That seems to me the moment. It's either that or it's not. Your Honor, to that point, the officer that was asking the questions was making the statements not just to the one individual, Hunter. He was making statements to all three of them at all times. It does seem that way. And on top of that, when he asks the question, can we frisk you, and I think it is Hunter that says no, but you hear the other one say, nah, nah, and you hear somebody else saying, I know my rights. In addition to that, right after that, Officer Sharp also says, don't walk away. And that's directed at Ward? And that's directed at, I believe it's directed at all of them. But at the very least, it's directed at one of them. And so let's say it's only directed at one of the three. But if you're in this situation and you're, again, a reasonable person, and that's our standard here, if you're in with three individuals and the officers are talking to all of you, and then let's say Mr. Hunter is moving and one of the officers says, don't walk away, a reasonable person would not feel free to leave at that point. And that is the crux of it. So between that and the fact that actually there is this frisk going on, and there was no question. The suppression hearing transcript shows that there was no question that regardless of how they answered that question as to whether or not they consented to be frisked, they were going to be frisked that day. Yeah, but the issue is not what the police were planning to do. I don't think that's part of this. Am I wrong? No, just as it's an objective standard on the part of the defendants, it's also objective on the part of the officers. I will agree with that. So the subjective intent of the officers isn't critical to this analysis. I do agree with you there. How do we reconcile these two lines of cases that say, as you correctly point out, that what would a reasonable person have believed was he or she free to leave? We get that. And then additionally, the cases say for a seizure to occur, there has to be actual submission to that show of authority. Yes. Where was the actual submission here that constituted the seizure before he ran? The actual submission came in the entire three minutes that the defendant didn't walk away and wasn't permitted to walk away prior to the time that he ran. You're assuming that he wasn't permitted to walk away. Why do you say not permitted? Because when Mr. Hunter tried to walk away, he was told specifically, don't walk away. And if you take a look at the video, it was not only that, but he actually – Hunter was the guy they were talking to, wasn't it? Hunter was – they were talking with all three of them. Well, I know you say that, but standing in front of Hunter, they're having a dialogue with Hunter. There's no doubt about that, is there? Correct. They were not having a dialogue with Ward, although you can argue that the dialogue with Hunter actually included Ward. I understand that. I would submit it would be impossible to parse out that they were – so in other words, a reasonable person would not believe, well, after he asks us these questions, after he asks us who we are and what our Social Security is and what we're doing here and whether or not – and he asked all three of them whether or not they were dealing in drugs. Did all three give Social Security numbers? At least two of them did. Did Ward? Yes. Yes. He was the one that they complained about that actually said his Social Security number five or six times in rapid succession. That was Mr. Ward. And so we have – so I would submit that it's an impossible task to put on a citizen to say, hey, I can parse out here that the police officers, even though they just accused me of drug dealing, that somehow I am free to walk away when they're asking my friend and telling them he's going to be frisked whether he wants to or not and watch my friend being frisked. And there was – and at that point, after he was frisked, they actually turned to Mr. Ward and actually said, come here. And did he? That's when he ran. But the point is he wouldn't have felt – a reasonable person, not him – a reasonable person would not have felt free to leave at any point during that process. And does it matter that if he had started to walk away and they told him, hey, come here, I mean, I think your argument would clearly be stronger. So is there any sort of dividing line there or do they not have to either stop him – they didn't stop him and they didn't tell him that he couldn't leave in any express way, so does that matter? It doesn't matter. I would agree with you, Judge McKeague, that there's a line here somewhere, right? And so the issue is where does that line occur? And I cited to a D.C. case in a Third Circuit case in my reply brief which talks about how there can be initial submission which does trigger the Fourth Amendment even if a defendant later runs. And I can think of – let's say that instead of three minutes in this case, let's say it was 20 minutes. Let's say it took them 20 minutes for all of this to occur and they were having this additional discussion with the other two or let's say they would have picked the second defendant instead of Mr. Ward as the second one to frisk and he waited all that time. At what point does it come where there's this submission? And I would submit to you that we just need to look – and it's great that we have the video in this case because if anyone objectively looks at this video and says, would a reasonable person have felt free to walk away from these officers in that instance? The answer's got to be no. I can certainly say that me dressed here today in my suit, had I been in front of that convenience store, had they done that and they'd done the same thing to my friends, I would have not felt free to walk away. And that's the standard that we deal with here. Mr. Shaddock, I can already hear you making the argument to the officers. You have no right to do this. Well, they – these – I've heard it. I've heard you enough that I'm pretty confident you would have not sat still quietly. Interestingly, Judge Sutton, these persons made that same argument to the officers. They said that they can't be – Well, they said we can't run. We didn't run, right? But they said you can't frisk us, and they were being frisked anyway, and they were. And there was no reason for the frisk. The officers testified that they were searching for narcotics and guns. They actually testified to that at the suppression hearing. But they also testified that they had no evidence that these defendants were armed and dangerous at the time they made the frisk. There was absolutely – The only way that we can correct these officers' actions in this case is to suppress the evidence and get a published decision that says we cannot do this as officers. I see my time is up, unless there are any further questions. Thank you. May it please the Court. Ben Glassman on behalf of the United States. The way to balance the two lines of cases, Judge McKeague, is exactly the way the Supreme Court has instructed this Court and all of us to balance those cases in Hodari D. The reasonable person would feel free to leave test, which my colleague focused on almost exclusively this morning, is a necessary but not sufficient test for determining whether someone has been seized in response to an officer's show of authority as opposed to physical restraint. So in this case, there was no physical restraint of Mr. Ward until after he had fled and discarded the gun. So the only question on whether he had been seized is whether he actually submitted to the officer's show of authority. And for the reasons that the Court has been discussing with my colleague this morning, the United States' position is that he did not. What do you do about it? I mean, it is so much easier if it's clear the officer's statements at a minimum to Hunter are directed to Ward, right? I think the case gets pretty easy, but it seems to me relevant for the reasonable person. If you're with some people and they're addressing all three of you or the whole group of you, when the question is can we frisk you, and it seems to be directed to everybody, it seems to be they're all saying no and they start frisking one of the people. I'm having a hard time understanding why the reasonable person doesn't think, doesn't look like we can leave. In fact, it's so clear we can't leave, they're not telling us they're going to frisk us against our will. That just seems to me, no matter how little or how much you know about the Fourth Amendment, a very strange thing to say, well, no, I can walk now. But whether a reasonable person would feel free to leave under those circumstances, Judge Sutton, Mr. Ward did not. He did feel free to leave. That's not the question. It is the question, Your Honor, respectfully, because the officer, let's say the officers were totally in the wrong, had no reasonable suspicion, which is not our position. We think that even if there was a seizure, there was reasonable suspicion, as the district court found. But if the officers give an instruction to Mr. Ward, show authority, and then he runs in response to it, he directly contradicts that authority, then he has not submitted to it and there's no seizure. Oh, that can't possibly. You're saying Hodari D. stands for that? Hodari D. says that the reasonable free to leave test, there's been a seizure only if a reasonable person wouldn't feel free to leave, but not any time a reasonable person wouldn't feel free to leave. If a reasonable person wouldn't feel free to leave, but this defendant does leave, then there's not a seizure. Yes, I think that's correct. What about the reality that he is submitting by staying there and they say don't walk away and he stays there that whole time? So as to that particular point. It can't be that you're seized and then they ratchet up the stakes. They're like, okay, you know, we're actually not looking for drugs. We think it's a murder and we think one of you has the weapon. And at that point, the person bolts because now the stakes have risen. All right, that's kind of what happened here. The stakes keep rising. It can't be the case that you've been seized because you stay, because you realize I really don't think I can get out of this here. But then once the stakes rise enough, you bolt and you say, oh, he didn't submit. Because the first time we said we're going to frisk you, that's when he ran. We have to be in agreement that's not the law. I think that's a fair point, Judge Sutton. So let me take you to the facts of this particular encounter and then try to match it with the law of this circuit and others in applying this test. As to the facts, I think what Judge McKee was commenting on with respect to what the video shows is accurate. That Ward was simply hanging out in this location when the officers were there, much as he had been doing all day. That the presence of the officers did not, so far as the video evidence reveals, appear to have any effect on Ward, who didn't, by the way, stay stationary. As you can see, and as Judge McKee mentioned, he was kind of milling around, turned his back to the officers, kind of floated a little bit towards the back, away. But there is no indication that Ward changed his behavior in any way in response to the presence of the officers or anything that the officers were doing until the officers directed a question directly to Ward, at which point he fled. As to the question of were they asking these questions to everyone, I would respectfully submit that the questions were directed principally, at least. If not, they weren't maybe saying, you, Mr. Hunter, here is our instruction. But it was principally directed to Mr. Hunter, and in support of that, not just the video. Everybody's giving their social security number, including Ward. Yes, so let me, and that's fine, because asking for and receiving a social security number or an identification is clearly within the realm of a consensual. I know you, I mean, I'm not being accusatory, but you're changing the point. You're flipping to a different point. The question is whether they're directing, the officers are directing this to everybody. It seems pretty obvious if everybody is being asked for their social security number that the conversation is as to everybody. I suppose my point, not trying to flip it, was that when you say this, what is this? Is this the instruction, come here, we're going to frisk you, or is this the question, do you all have IDs on you? The initial preliminary question, do you all have IDs on you, that's clearly directed to everybody. How about the question of can we frisk you, isn't that clearly directed to everybody? You know, I don't think so. Officer Oreck testified on cross-examination with respect to Ward as distinct from Hunter. There wasn't an officer around him or anything like that. We haven't even talked to him yet. I haven't stopped him or anything. But, I mean, the pictures are worth a thousand words. I thought the video shows it's addressed to everybody and everybody responds with, nah, no, we know our rights. They're not just engaging Hunter. Hunter's not the only one that feels engaged, is the way to put it. Let's assume that it was directed at everybody. If they had all said, sure, go ahead, there's no seizure. You can ask somebody if you can pat them down. And once the attempted pat-down turns to Ward, that's the point at which he flees. I think that's exactly right. So we have to figure out then whether simply asking whether you can pat somebody down and then proceeding to pat one down without their permission then constitutes an effective seizure of somebody else. Exactly. That's the case. I think that's a fair point. I mean, I think if you look at this Court's opinion, two points in response to that. First, if you look at this Court's opinion, which is albeit unpublished in Johnson, the Court says, hey, there's got to be, when we're talking about submission to authority, there's got to be something between submission and just not fleeing. There's got to be some manifestation of submission that's not just not fleeing. Otherwise, because the Supreme Court says it's got to be actual submission to a show of authority. That's actually three points. That's point one. Point two, my colleague in his reply briefing this morning relied on the Third Circuit case of Coggins. I actually think Coggins is a really good case for the United States position here. Coggins is the Third Circuit case where the DEA agent is suspicious of people who are traveling as to whether or not they're engaged in drug trafficking. He approaches a group of people at the airport. He asks the group of people for ID and plane tickets. They give him those documents. He inspects them. They're engaged in discussion. Coggins then says, I need to go to the bathroom. I'm going to go to the bathroom. Then the agent says to Coggins, no, sit down. You're going to have to wait. And he does. And then a minute or two later says, actually, I really am going to go to the bathroom. And he leaves. The court in Coggins, the Third Circuit says, hey, there was an initial seizure when the agent told Coggins in response to saying, I'm going to get up and go to the bathroom and leave. No, you sit down. And, in fact, the court is explicit that the- That's a seizure, but isn't the relevant point what's going on is to the others? Well, but this is where I'm going, Judge Sutton. The court is then explicit that the conversation, the asking for the ID, the asking for the plane tickets and looking at them, that was not the seizure. That's consensual. I'm going to accept all that, but I thought this was Judge McKee's question. It's like this associational view of seizure. If you say to somebody, can we frisk you, and you're in a group, or you say it to the whole group, they all say no, and they start frisking, in this case, Hunter. Clearly, Hunter's seized. We're all on the same page there, right? Agreed. So that's what I mean by the associational view of Fourth Amendment seizure. And that's the case we need. We need the fact pattern you just told us, but then what did the court say about the other people standing there? I would say the reasonable person in a close group. I mean, say it's a family. I think we'd think this was very different if it was the parents and a kid, that the rest of the family felt seized, probably. So it's not a family here. It's friends hanging out. So that's the case that's dispositive. My instinct is if you're seizing one, you're seizing them all, if you're directing to everybody. But maybe I'm wrong. Well, I wish that I did have the case right off on the tip of my tongue to give you, other than the general proposition that Fourth Amendment rights are personal and individual, and if one person is seized, it does not necessarily mean that another person is seized. Does it matter along this analysis what happened between the time they started to frisk Hunter against his express refusal and when they then ultimately turned to Ward? If Ward had fled, the moment they put hands on Hunter, it seems to me nobody could say that he had a reasonable expectation he had to stay because Hunter was being patted down, because he didn't stay. Now here, I think there is a matter of, I don't know whether it's a second or seconds or minutes or whatever it is, but it's a very short period of time, it seems to me, between putting hands on Hunter and when Ward turns and runs. So what happens during that period and how long can it be and what is an indicia of having submitted to authority? That brings me to what should have been my last point in response to Judge Sutton's question. I totally agree with you and I hope the whole court would agree that if the facts were as slightly different as you described, there would be no question here. But I think the last point is that this court, in Jeter, a published opinion, and other courts, but this court has made clear that a momentary pause in response to a show of authority does not amount to submission to authority within the meaning of the Fourth Amendment. That's Jeter, that's the person who was on his bicycle, who when he saw the officers who blocked his path, stopped, and then when the officers tried to engage him, took off, and this court in Jeter said that momentary stop, even though it was a momentary pause, did not amount to a submission of authority. So at most, what we're talking about here is a second or two after the initial question, when Ward does nothing in particular, doesn't put his hands up or anything like that, just continues to be present before questioning turns to Ward specifically and he flees. Is it really just a second or two? I think so. I mean, the video will speak for itself. I mean, yeah, the entire encounter is only three minutes from start to finish. Well, it seems like it would be fair to look at one, how long it was, whatever that is, and then what did he do in response to the patting down of Hunter? Did he keep doing whatever he was doing, or did his conduct indicate in some way that he was conforming? That is exactly what the United States thinks is the right inquiry, because he's got to submit to authorities. So like I was saying in response, if he'd put his hands up, if he'd said, well, I'm going to stay here, if he had done something other than what he was doing before, because as the Supreme Court explained in Brendan, whether someone has been seized, whether someone submits depends on what they were doing immediately beforehand so that you can tell. So, yes, I think that that is the exact correct inquiry. And that is why the United States submitted that video, which we think is excellent evidence. And I guess as for the timing and so on, it will have to speak for itself. I've urged, the United States has urged that the court decide the case on that basis, principally because it just struck me as odd analytically to talk about whether a seizure is justified by reasonable suspicion if there was in fact no seizure. But, of course, the district court also said that the seizure and frisking, had there been one, was warranted by reasonable suspicion. What's your best argument for that? The best argument for that is, I think the best case for us is, as stated in the brief, is the car case. Well, but for you, the key facts, what are the key facts that aren't generalized to cover the whole square mile? Sure, the key, well, right, because the high crime neighborhood was just that square mile, but this particular location, like out front the parking lot of that convenience store, neighborhood residents had complained to the police about drug trafficking at that specific location. There was also a testimony that at that specific location, there had been a murder about a year and a half earlier, and that these officers did not act immediately on seeing these guys the first time. They actually started their shift at 630 in the morning. This stop was at 130 in the afternoon. And so the testimony was that essentially they were hanging out in that area, that specific location, the entire day, not going into the store, not going to the housing complex, but just going in and out of the SUV, which in the officer's experience was consistent with drug trafficking. Those are the major facts that we rely on and that the district court relied on. I do think that that is, I think that that's a relatively close question on reasonable suspicion, but I think that the Carr case supports the district court's decision. Don't you think the other one's relatively close? Yeah, I completely agree with the court that both of these questions, neither of these questions is immediately obvious, but I think that given the facts as put in the video, that this defendant did not submit to the officer's show of authority. But if he did, I also defend the district court's rationale. If there are no further questions, the United States asks this court to affirm. Just one point on the last argument on reasonable suspicion. If it wasn't those gentlemen and it had been me and my friends that had been there all day in my suit and gone in and out of my SUV a couple of times, what we're saying is that was reasonable suspicion to suspect that I was drug trafficking because of the area that the convenience store was in and because there had been anonymous complaints of drug trafficking that they couldn't even identify. But it seems like the key there is not so much that it was a high crime area and that they were hanging out. There shouldn't be reasonable suspicion. It shouldn't occur just because somebody was hanging out. It seems like the key would be going in and out of this car and the officers testifying that in their experience that is indicia of drug dealing. Now, they didn't say they saw a hand-to-hand transaction arising out of going in and out of the car, but just sort of logically speaking, why would somebody be going in and out of the car? What would be the other explanations that would negate that creating reasonable suspicion? Two things on that. Number one, we do not know from the record how many times any of the individuals went in and out of that car. They could talk about one specific instance. So we don't know that number. We don't know the amount of times or when during the day they did that. There's all kinds of innocent explanations why somebody would go in and out of their car several times during a day. If they're a salesperson, if they just happen to have their lunch in the car and it's lunchtime and they get their lunch out of the car, that is certainly not enough. Well, you know, you're having your suit on might raise even more suspicion than people who are casually dressed because it would look like you had some place to be that was more important than hanging out in front of a convenience store. If you'd been hanging out there for hours going in and out of your car, I would think that would be pretty peculiar behavior. And me personally, me wearing a tie is always suspicious behavior anyway. From bad to worse. So turning to the... Before we leave, the fact that there are innocent explanations doesn't negate the fact, at least in the officer's experience, correctly or incorrectly, that's indicia of drug dealing. I would agree with you that the officers could use their experience to say that going in and out of a vehicle several times in a day is indicative of drug trafficking. It's not enough to get to reasonable suspicion. Turning to the second issue, again, we cannot look at Mr. Ward in a vacuum here. We cannot ask any citizen to take themselves out of the situation and say, well, the officers were talking to my friend, they weren't talking to me. If you look at the video, the Officer Sharp actually says, you guys, you guys have been here all day. You guys aren't dealing in drugs, are you? He's not referring just to Mr. Hunter. He's saying you guys over and over and over again. See, my time is up. Are there any further questions? Thank you, Your Honors. Well, as always, we thank you both for your argument, and we'll consider the case carefully.